UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO 17-11249-RWZ

MELISSA VELAZQUEZ,
*individually and as representative of a class of similarly situated persons,
and on behalf of the Massachusetts Financial Services Company
Defined Contribution Plan
and the Massachusetts Financial Services Company MFSavings Retirement Plan*

v.

MASSACHUSETTS FINANCIAL SERVICES COMPANY,
d/b/a MFS Investment Management,
MASSACHUSETTS FINANCIAL SERVICES COMPANY RETIREMENT COMMITTEE,
MASSACHUSETTS FINANCIAL SERVICES COMPANY RETIREMENT
INVESTMENT COMMITTEE,
MFS SERVICE CENTER, INC.,
and JOHN DOES 1–30

<u>ORDER</u>

July 19, 2018

ZOBEL, S.D.J.

Plaintiff in this purported class action challenges the management of two

retirement plans, with allegations that Defendants Massachusetts Financial Services

Company d/b/a MFS Investment Management, the Massachusetts Financial Services

Company Retirement Committee, the Massachusetts Financial Services Company

Retirement Investment Committee, MFS Service Center, Inc., and John Does 1–30

have violated the Employee Retirement Income Securities Act ("ERISA"), 29 U.S.C. §

1001 *et seq.* Defendants move to dismiss.  For the reasons stated below, the motion is allowed in part and denied in part.

## I.    Background[1]

ERISA requires that fiduciaries act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B). These general duties of loyalty and prudence are refined in 29 U.S.C. § 1106, which prohibits fiduciaries from engaging in certain transactions alleged to have occurred here.

Plaintiff is a former employee of defendant Massachusetts Financial Services Company ("MFS").  During the relevant period, MFS offered eligible employees two tax-deferred retirement plans: the employee-funded Massachusetts Financial Services Company MFSavings Retirement Plan ("Employee Plan"), and the employer-funded Massachusetts Financial Services Company Defined Contribution Plan ("Employer Plan"), (together, the "Plans").  Under the Employee Plan, employees could elect to contribute anywhere from one to 85 percent of their salary to their plan account, whereas MFS contributed an amount equal to 15 percent of participants' salary to the Employer Plan.

Plaintiff participated in the Employer Plan until 2014, but asserts claims on behalf of both Plans and a putative class comprised of "[a]ll participants and beneficiaries of the [Plans] at any time on or after July 7, 2011 . . . ."  Compl. ¶¶ 8-9, 125.  She alleges

---

[1]    The facts are recited as alleged in plaintiff's complaint, Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 5 (1st Cir. 2011), augmented by the accompanying Plan Documents and Form 5500s routinely considered on motions to dismiss in the ERISA context.  See Kling v. Fid. Mgmt. Tr. Co., 270 F. Supp. 2d 121, 127-28 (D. Mass. 2003).

essentially that instead of acting in the best interest of the Plans and their participants, defendants used the Plans as an opportunity to promote their own mutual fund business to participants' detriment.  MFS funds comprised "the vast majority" – up to 98 percent – of the investment options in both Plans since at least 2011.  Compl. ¶¶ 24, 26, 67.  Even the Plans' nonproprietary funds are alleged to have benefited MFS in that the alternatives, known as Russell Funds, were managed by various subadvisors including MFS affiliates.

Both Plans used the same processes for selecting and monitoring investments, and both used the same recordkeepers, compensated the same way.  Accordingly, plaintiff alleges that "the two plans operated functionally as though they were a single plan."  Compl. ¶ 24.  Combined, the Plans had $515,246,820 in assets as of the end of 2012.  For both Plans, MFS was a Plan sponsor and named fiduciary, and had authority to appoint and remove members to the advisory committees.  All such members were MFS employees appointed by the MFS Board of Directors.  MFS acted during the relevant period as investment manager for each of the proprietary funds, in exchange for which it collected monthly fees from Plan assets invested in proprietary funds; as such, it is a "party in interest" under 29 U.S.C. § 1002(14).  MFS then applied a portion of its monthly management fees to pay the Plans' recordkeeper and to compensate MFS Service Center, Inc.[2]

MFS delegated a portion of its fiduciary responsibilities for investing Plan assets to the Investment Committee, which was charged with maintaining and monitoring the

---

[2]     MFS Service Center, Inc., ("MFSC") is a wholly-owned subsidiary of MFS.  MFSC provided shareholder servicing functions, including as transfer and dividend-paying agent, for which it was compensated.  This makes it, too, a statutory "party in interest."

Plans' investments.  MFS similarly delegated a portion of its fiduciary responsibilities for administering Plan assets to the Retirement Committee, which selected recordkeepers and determined their compensation.  During the relevant period, the Investment Committee removed no MFS funds from the Plans, though plaintiff alleges the funds contained many duplicative investments.  She complains as well of duplicative additions of high-fee Russell funds "generally rejected by other defined contribution plans" during the relevant period.  Compl. ¶ 74.  Indeed, by the end of 2015, "the Plans were the only two defined contribution plans (out of over 3,000 with more than $200 million in assets) to offer any of the Russell funds included within the Plans at the time."  Id.

Due in part to defendants' failure to remove expensive, under-performing proprietary funds, plaintiff alleges the Plans' expenses were significantly higher than those of comparable retirement plans.  Specifically, "estimated total Plan costs for 2012 were approximately $4,416,791, or 0.86% of the more than $515 million in assets within the Plans."  Compl. ¶ 79.  By contrast, the median total cost in 2012 for plans with between $500 million and $1 billion in assets was 0.45%; for plans in the $250-$500 million asset range, 0.47%; and for plans in the $100-$250 million range, 0.57%.  For 2014, $5,366,667 in costs represented 0.80% of the more than $670 million in combined plan assets, whereas the median cost for plans of that size was then 0.44%.  Plaintiff thus alleges that "in 2012 the Plans were approximately 91% more expensive than the median similarly sized plan, and in 2014 they were 82% more expensive."  Compl. ¶ 80.  Less expensive nonproprietary alternatives – both actively and passively managed – offered similar or better performance, but defendants failed to use them because to do so would have been contrary to their business interests.

Plaintiff further alleges that defendants failed to obtain the lowest-cost share class of numerous mutual funds in the Plans, even though lower-cost share classes are routinely available to institutional investors with over $1 million in assets and attendant increased bargaining power, and even though more expensive share classes offer no additional value.  For example, the Committees retained institutional shares of the MFS Growth and Value Funds with expense ratios of 0.87% and 0.71% despite the availability of identical R5 shares with expense ratios of 0.78% and 0.60%.  As a result, MFS collected higher fees for the same services it would have provided had the Plans owned the cheaper R5 shares of the Growth Fund; the same was true of at least 38 other funds in the Plans.

Also reflected in the Plans' high costs are excessive recordkeeping fees.  The cost of recordkeeping services depends on the number of participants in a plan, and plaintiff estimates that a "normal range" for plans like those at issue would have been $50-80 per participant.  Compl. ¶ 98.  Instead, defendants paid in excess of $500 in recordkeeping fees per participant until September 2015, when they changed providers.

Another factor contributing to high Plan costs was defendants' failure to invest in non-mutual fund alternatives like separate accounts and collective trusts, which carry significantly lower fees, despite offering them to shareholders in other plans.

Finally, in addition to failing to remove duplicative funds as alleged above, defendants failed to monitor and remove poorly performing funds.  Plaintiff cites the Plans' money market funds specifically, which returned 0.01% or less from 2011 through 2015 but featured expense ratios over 0.60%.  In contrast, stable value funds offer the same protection of principal with reliably better returns.  Defendants did offer a

stable value fund for a time, but liquidated it without replacement in 2014 after years of underperformance.

Plaintiff sues defendants for breach of the fiduciary duties of loyalty and prudence (Count I), failure to monitor fiduciaries (Count II), prohibited transactions with a party in interest (Count III), prohibited transactions with a fiduciary (Count IV), and equitable restitution of ill-gotten proceeds (Count V). She lacked knowledge of material facts necessary to understand the alleged ERISA violations until she filed her complaint, and continues to lack actual knowledge of the specifics of defendants' decision-making processes. Defendants move to dismiss. In addition to arguing that plaintiff has failed to state a cognizable claim, they contend that any such claims are time-barred and that she lacks standing to bring claims on behalf of a plan in which she did not participate.

## II.   Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. For purposes of a motion to dismiss, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. See Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 52–53 (1st Cir. 2013).

III.     **Analysis**

A.     **Threshold Issues**

1.     **Standing**

Defendants argue that plaintiff lacks standing to bring claims on behalf of a plan

in which she was never enrolled and for the period after which she closed her account.

This position "erroneously conflate[s] the requirements of Article III . . . with the

procedural requirements of Rule 23[.]"  In re Nexium Antitrust Litig., 968 F. Supp. 2d

367, 404 (D. Mass. 2013); see Glass Dimensions, Inc. v. State St. Bank & Tr. Co., 285

F.R.D. 169, 175 (D. Mass. 2012) (noting that "defendants have conflated standing

requirements with class certification analysis," and finding that plaintiff "has established

constitutional standing with respect to the 257 funds that it did not purchase.")  It is well-

established that for the purpose of constitutional standing, a plaintiff need not have

invested in each fund at issue, but must merely plead an injury implicating defendants'

fund management practices.  See, e.g., Urakhchin v. Allianz Asset Mgmt. of Am., L.P.,

No. 15-1614, 2016 WL 4507117, at *4 (C.D. Cal. Aug. 5, 2016), and cases cited;

Wildman v. Am. Century Servs., LLC, No. 4:16-CV-00737, 2017 WL 6045487, at *3

(W.D. Mo. Dec. 6, 2017).  That requirement is amply satisfied here.

2.     **Statute of Limitations**

The limitations period for all claims arising under ERISA is six years after the

date of the last action or omission constituting a part of the breach or violation, or three

years after the earliest date on which the plaintiff had actual knowledge of the breach or

violation.  29 U.S.C. § 1113.  Defendants argue that the three-year statute bars

plaintiff's claims because all material facts, including fee schedules and performance for

proprietary funds, were provided to participants in required Plan disclosures.  However,

plaintiff specifically alleges her lack of knowledge of material facts necessary to

recognize a breach or violation, including

> the availability of less expensive alternative investments, the costs of the
> Plans' investments compared to those in similarly-sized plans, investment
> performance versus other available alternatives, the excessiveness of the
> Plans' recordkeeping costs compared to alternative service providers, the
> availability of less expensive share classes of investments held by the
> Plans, the availability of less expensive separate accounts and collective
> trust alternatives, and comparisons of the Plans' overall costs to the costs
> of other similarly-sized plans.

Compl. ¶123.  This allegation is accepted as true on a motion to dismiss, and courts

have declined at this stage to find that plan document disclosures confer actual

knowledge where plaintiffs allege, as here, "a deficient selection process or fees that

are excessive in comparison to a benchmark."  Wildman v. Am. Century Servs., LLC,

237 F. Supp. 3d 902, 911 (W.D. Mo. 2017); see Leber v. Citigroup 401(k) Plan Inv.

Comm., No. 07-CV-9329, 2014 WL 4851816, at *4 (S.D.N.Y. Sept. 30, 2014) ("Plaintiffs

could not have known that the fees were excessive, and thus a basis for an ERISA

claim, without the relevant comparison point for assessing excessiveness.").  Because

defendants have not shown it is clear from the face of the complaint that plaintiff had

actual knowledge of fees for the comparable alternative funds more than three years

before she filed the instant action, it is not time-barred.

## B.    Breach of Fiduciary Duty and Failure to Monitor (Counts I and II)

Counsel for both sides have routinely faced each other in similar ERISA litigation

across the country, and each relies on a line of fiduciary duty cases in its favor.  Plaintiff

cites heavily to Eighth Circuit precedent, see, e.g., Tussey v. ABB, Inc., 746 F.3d 827

(7th Cir. 2014); Braden v. Wal-Mart Stores, Inc., 588 F.3d 585 (8th Cir. 2009); Wildman,

<u>supra</u>; <u>Krueger v. Ameriprise Fin. Inc.</u>, 304 F.R.D. 559 (D. Minn. 2014), whereas defendants find friendlier law just to the east in the Seventh Circuit, <u>see</u>, <u>e.g.</u>, <u>Loomis v. Exelon Corp.</u>, 658 F.3d 667 (7th Cir. 2011); <u>Hecker v. Deere & Co.</u>, 556 F.3d 575 (7th Cir. 2009); <u>Divane v. Northwestern University</u>, No. 16-cv-08157, 2018 WL 2388118 (N.D. Ill. May 25, 2018).  The principal distinguishing feature between the two lines is whether or not self-dealing is alleged.  <u>Cf.</u> <u>Laboy v. Bd. of Trustees of Bldg. Serv.</u>, No. 11-CV-5127, 2012 WL 701397, at *3 (S.D.N.Y. Mar. 6, 2012) ("[A]llegations of self-dealing are what set apart the [defendant-friendly] judicial decisions in <u>Young</u> and <u>Hecker</u> . . . from those [favoring plaintiff] in <u>Leber</u> and <u>Braden</u>.").  Having thus set the stage, I turn to the substance.

ERISA's duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a)(1).  The next provision specifies that the fiduciary must also act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  <u>Id.</u> § 1104(a)(1)(A).  The twin duty of prudence obligates the fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."  <u>Id.</u> § 1104(a)(1)(B).

"Courts often look to the common law of trusts '[i]n determining the contours of an ERISA fiduciary's duty."  <u>Patterson v. The Capital Grp. Cos., Inc.</u>, No. 17-CV-4399, 2018 WL 748104, at *4 (C.D. Cal. Jan. 23, 2018) (quoting <u>Tibble v. Edison Int'l.</u>, 135 S. Ct. 1823, 1828 (2015)).  "Under the common law of trusts, the duty of loyalty prohibits a fiduciary from 'engaging in transactions that involve self-dealing or that otherwise involve

or create a conflict between the trustee's fiduciary duties and personal interests.' And
the duty of prudence requires trustees to 'incur only costs that are reasonable in amount
and appropriate to the investment responsibilities of the trusteeship.'" Id. (quoting
Restatement (Third) of Trusts). Whether a complaint states a claim of imprudence under
ERISA is thus a necessarily context-specific inquiry. Barchock v. CVS Health Corp.,
886 F.3d 43, 44 (1st Cir. 2018) (quoting Fifth Third Bancorp v. Dudenhoeffer, 134 S.Ct.
2459, 2471 (2014)).

   The test of prudence is one of process rather than ultimate investment
performance and cannot be measured in hindsight. Bunch v. W.R. Grace & Co., 555
F.3d 1, 7 (1st Cir. 2009). Nonetheless, "cost-conscious management is fundamental to
prudence in the investment function," Tibble v. Edison Int'l, 843 F.3d 1187, 1197-98 (9th
Cir. 2016) (en banc) (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)), and a
fiduciary breaches its duty when it "fail[s] to properly monitor investments and remove
imprudent ones." Tibble, 135 S.Ct. at 1829.

   It is certainly true that "nothing in ERISA requires every fiduciary to scour the
market to find and offer the cheapest possible fund." Hecker, 556 F.3d at 586 (affirming
dismissal where defendants offered a wide array of funds with expense ratios ranging
from .07% to just over 1%). A claim of breach is sufficiently made out, however, when a
plaintiff plausibly alleges that the higher fees were unjustified or otherwise improper.
See, e.g., Main v. Am. Airlines Inc., 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017)
(allegations that proprietary mutual funds "were more expensive than similar
alternatives" supported claim of breach of fiduciary duty); Moreno v. Deutsche Bank Am.
Holding Corp., No. 15-CV-9936, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016)

(allegations of excessive fees in connection with proprietary funds were sufficient to raise an inference that defendants' process was flawed); <u>Urakhchin</u>, 2016 WL 4507117, at *7 (same).

Here, plaintiff alleges not only that defendants collected excessive fees for high-cost proprietary funds, but also that they failed to shed those funds in favor of cheaper similar alternatives because to do so "would have cost [them their] profits."  Compl. ¶ 119.  This sufficiently states a claim for breach of fiduciary duties.  <u>See</u> <u>Wildman</u>, 237 F. Supp. 3d at 915 ("[V]iewed collectively in conjunction with Plaintiffs' allegations that Defendants' decisions were motivated by self-interest and reflected a failure to act as a prudent investor, these allegations sufficiently support a claim for breach of fiduciary duty").  Defendants' motion to dismiss is accordingly denied as to Count I.

Count II alleges that defendants failed to adequately monitor the Plans' managers and that they are liable for the breaches of their co-fiduciaries pursuant to 29 U.S.C. § 1109(a).  A claim for failure to monitor is derivative of the underlying breach. <u>Moreno</u>, 2016 WL 5957307, at *8.  Because I find plaintiff has sufficiently pleaded Count I, Count II also survives.  <u>Cf.</u> <u>Krueger v. Ameriprise Fin., Inc.</u>, No.11-CV-02781, 2012 WL 5873825, at *18 (D. Minn. Nov. 20, 2012) ("Courts have been unwilling to delineate and probe the scope of defendants' monitoring duties on motions to dismiss, and have permitted such claims to proceed forward to discovery") (citations omitted).

### C.      Prohibited Transactions (Counts III and IV)

In Counts III and IV, plaintiff alleges that the investment of Plan assets in affiliated mutual funds constitutes prohibited transactions in violation of 29 U.S.C. § 1106.  Section 1106 "supplements the fiduciary's general duty of loyalty to the plan's

beneficiaries . . . by categorically barring certain transactions deemed likely to injure the pension plan." Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 241–42 (2000) (citations omitted).  Such prohibited transactions include those involving affiliated parties in interest, 29 U.S.C. § 1106(a), or those conducted in a fiduciary's own interests, 29 U.S.C. § 1106(b).

Defendants emphasize that the use of affiliated funds is specifically permitted under ERISA's Prohibited Transaction Exemption 77-3 ("PTE 77-3").  PTE 77-3 allows plans sponsored by investment fund advisors to invest in affiliated investment funds if the plan does not:

> (a) pay any fees to the investment adviser except via the investment company's payment of its standard advisory and other fees;
> (b) pay a redemption fee to any party other than the investment company itself;
> (c) pay a sales commission; and
> (d) have dealings with the investment company on terms less favorable than dealings between the investment company and other shareholders.

42 Fed. Reg. 18,734–35 (1977).  Defendants bear the burden of proving this exemption, but plaintiff must plead something to show why the exemption would not apply.  See Leber v. Citigroup, Inc., No. 07-CV-9329, 2010 WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010).

At least at this stage, that requirement is satisfied by plaintiff's allegation that defendants failed to offer Plan participants the separate account options and less expensive share classes available to other investors, indicating that the exemption's fourth condition is not met.  Compl. ¶¶ 86-91.  See Brotherston v. Putnam Inv. LLC, No. 15-CV-13825, 2016 WL 1397427, at *1 and ECF No. 33 (D. Mass. Apr. 6, 2016) (denying motion to dismiss despite defendants' assertion of PTE 77-3 exemption);

Krueger, 2012 WL 5873825, at *17 (finding PTE 77-3 inapplicable in light of allegations that defendants "failed to select the lowest-cost share class" and paid unreasonable fees); Gipson v. Wells Fargo, Inc., No. 08-CV-4546, 2009 WL 702004, at *4 (D. Minn. Mar. 13, 2009) (same).  Defendants' motion is thus denied as to Count III.

In Count IV, plaintiff alleges that defendants' mutual fund fees violate 29 U.S.C. §§ 1106(a)(1)(D), 1106(b)(1), which prohibit self-interested transactions involving "plan assets."  Compl. ¶¶ 149-62.  Defendants maintain that claim must fail where such fees are paid out of fund, rather than Plan, assets.  Brotherston v. Putnam Inv. LLC, No. 15-CV-13825, 2017 WL 1196648, at *5-6 (D. Mass. Mar. 30, 2017) ("management fees are not paid out of plan assets," and are therefore not subject to the provisions of ERISA governing plan assets).  Though procedurally distinguishable, Brotherston relied on binding precedent to reject a very similar plan asset argument as a matter of law.  Id., citing In re Fidelity ERISA Float Litig., 829 F.3d 55, 62 (1st Cir. 2016) ("Cash held by a mutual fund is not transmuted into a plan asset when it is received by an intermediary whose obligation is to transfer it directly to a participant.").[3]  Because I agree that plaintiff's broad construction of Plan assets is foreclosed in the First Circuit, defendants' motion is allowed as to Count IV.

## D.      Equitable Relief (Count V)

Plaintiff's final count seeks equitable relief under 29 U.S.C. § 1132(a)(3) in defendants' non-fiduciary capacity.  Such relief is available only where clearly traceable to "particular funds or property in the defendant's possession," Great-W. Life & Annuity

---

[3]      Plaintiff argues that the transfers at issue are indirect and may thus still implicate Plan assets after In re Fidelity.  The Brotherston court also considered and rejected this argument.  2017 WL 1196648, at *5.

Ins. Co. v. Knudson, 534 U.S. 204, 213 (2002); see Todisco v. Verizon Commc'ns, Inc., 497 F.3d 95, 99 (1st Cir. 2007).  Specifically, plaintiff seeks to recover "all assets of the Plans transferred to any of the MFS entities."  Compl. ¶ 66.  This request is insufficiently limited to the profits on particular property held by defendants.  See Todisco, supra; see also, Moreno, 2016 WL 5957307, at *9 (dismissing equitable relief claim demanding "all monies. . . received by the Employer Defendants as a result of the Plan's investments in affiliated mutual funds").  Disgorgement is similarly unavailable where section 1132(a)(3) requires a showing that the non-fiduciaries "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful." Harris Tr. & Sav. Bank, 530 U.S. at 251.  Plaintiff has not pleaded such scienter here. Defendants' motion is allowed as to Count V.

## IV.     Conclusion

For the foregoing reasons, defendants' motion to dismiss (Docket # 23) is denied as to Counts I, II, and III, and allowed as to Counts IV and V.


_____July 19, 2018 _____          _____/s/Rya W. Zobel_____
        DATE                                         RYA W. ZOBEL
                                      SENIOR UNITED STATES DISTRICT JUDGE