# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Melissa Velazquez  and Frances Fuentes-Noriega, individually and as representatives of a class of similarly situated persons, and on behalf of the Massachusetts Financial Services Company Defined Contribution Plan and the Massachusetts Financial Services Company MFSavings Retirement Plan,<br><br>     Plaintiffs,<br><br>v.<br><br>Massachusetts Financial Services Company d/b/a MFS Investment Management, the Massachusetts Financial Services Company Retirement Committee, and the Massachusetts Financial Services Company Retirement Investment Committee | Case No. 1:17-cv-11249-RWZ<br><br>**AMENDED COMPLAINT**<br><br>**CLASS ACTION** |

## NATURE OF THE ACTION

1. Plaintiffs Melissa Velazquez and Frances Fuentes-Noriega, individually and as representatives of the Class described herein, and on behalf of the Massachusetts Financial Services Company Defined Contribution Plan ("DC Plan") and the Massachusetts Financial Services Company MFSavings Retirement Plan ("MFSavings Plan") (collectively, the "Plans"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Massachusetts Financial Services Company ("MFS"), the Massachusetts Financial Services Company Retirement Committee (the "Retirement Committee"), and the Massachusetts Financial Services Company Retirement Investment Committee (the "Investment Committee") (collectively, the "Committees", and together with MFS, the "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in prohibited transactions with respect to the Plans in violation of

ERISA, to the detriment of the Plans and their participants and beneficiaries. Plaintiffs bring this action to remedy this unlawful conduct and obtain any other appropriate relief as provided by ERISA.

## **PRELIMINARY STATEMENT**

2.      As of the end of 2016, Americans had approximately $7 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $25.3 Trillion in Fourth Quarter 2016* (Mar. 22, 2017), *available at* https://www.ici.org/research/stats/retirement/ret_16_q4. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. *See* BANKRATE, *Pensions Decline as 401(k) Plans Multiply* (July 24, 2014), *available at* http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx. By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Thus, the employer has no incentive to keep

costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

4.      The real life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career. *See* Melanie Hicken, *Your Employer May Cost You $100K in Retirement Savings*, CNN MONEY (Mar. 27, 2013), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees/. Put another way, excessive fees can force a worker to work an extra five to six years to make up for the excess fees that were paid. *Id.*

5.      For financial service companies like MFS, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan's investment decisions by, for example, filling the plan with higher-cost proprietary investment products that a disinterested fiduciary would not choose.

6.      To safeguard against the financial incentives for disloyalty and imprudence in defined contribution plans, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

7.      Defendants do not act in the best interest of the Plans and their participants. Instead, Defendants have used the Plans as an opportunity to promote MFS's mutual fund business and maximize profits at the expense of the Plans and their participants. Defendants

loaded the Plans primarily with MFS's investment offerings, without investigating whether Plan participants would be better served by investments managed by unaffiliated companies.

8.     The retention of these proprietary mutual funds has cost Plan participants millions of dollars in excess fees. For example, in 2012, the Plans' total expenses were approximately 91% higher than the median total costs for retirement plans with between $500 million and $1 billion in assets (the Plans had a combined $515,246,820 in assets as of the end of 2012). The Plans' high costs are largely attributable to Defendants' selection and retention of high-cost proprietary mutual funds as investment options within the Plan.  In addition, Defendants failed to select the least expensive share class available for the Plan's designated investment alternatives, failed to investigate the use of separate accounts and collective trusts as alternatives to mutual funds, and failed to monitor and control recordkeeping expenses.

9.     Defendants' mismanagement of the Plan extends beyond their failure to adequately control Plan costs. Defendants also have failed to remove poorly performing investments from the Plan, in breach of their fiduciary duties.

10.     Defendants' mismanagement of the Plan, and prioritization of MFS's profits over the interests of the participants and beneficiaries of the Plan, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

11.     The direct and indirect transfer of Plan assets to MFS and provision of services to the Plans for unreasonable compensation also constituted prohibited transactions in violation of 29 U.S.C. § 1106.

12.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), failure to monitor fiduciaries (Count Two), and prohibited transactions with a party-in-interest (Count Three).[1]

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2), which provides that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

14.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

15.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found. In addition, Plaintiff Melissa Velazquez resides in this District.

## THE PARTIES

### PLAINTIFFS

16.     Plaintiff Melissa Velazquez ("Velazquez") resides in Roslindale, Massachusetts and was a participant in the DC Plan from prior to the start of the class period until 2014. Velazquez is entitled to receive benefits from the DC Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account

---

[1] Pursuant to the Court's Order on Defendants' earlier motion to dismiss (ECF No. 44), Plaintiffs have dropped Counts IV and V of their original Complaint and have dropped MFS Service Center, Inc. ("MFSC") as a named defendant to this Amended Complaint, but do so without prejudice to their right to replead those claims and reassert claims against MFSC in the event that the dismissal of those previous counts is later vacated or reversed in the event of an appeal.

would have been worth at that time had Defendants not violated ERISA as described herein. While a participant, Velazquez was invested in several different funds offered within the Plans, including the MFS Moderate Allocation Fund, the MFS Money Market Fund, Massachusetts Investors Trust, MFS New Discovery, MFS Utilities, and MFS Global Growth. All of these funds were managed by MFS. Velazquez has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Furthermore, MFS and its subsidiary MFSC (the "MFS entities"), have been unjustly enriched from the various fees and expenses generated as a result of Velazquez's Plan investments.

17.     Plaintiff Frances Fuentes-Noriega ("Fuentes-Noriega") resides in Guaynabo, Puerto Rico and has been a participant in the DC Plan and the MFSavings Plan from prior to the start of the class period to the present. As a participant, Fuentes-Noriega has invested in several different funds offered within the Plans, including the MFS International Value Fund, MFS Value Fund, MFS Technology Fund, MFS Research Fund, MFS Utilities Fund, MFS Emerging Markets Equity Fund, MFS Global Equity Fund, MFS Massachusetts Investors Trust, MFS Massachusetts Investors Growth Stock Fund, MFS International Diversification Fund, MFS Research International Fund, MFS Emerging Markets Debt Fund, MFS Strategic Income Fund, MFS Total Return Bond Fund, MFS Global Total Return Fund, MFS Diversified Income Fund, MFS International Diversification Fund, and MFS Total Return Fund. All of these funds were managed by MFS. Fuentes-Noriega has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein. Furthermore, the MFS entities have been unjustly enriched from the various fees and expenses generated as a result of Fuentes-Noriega's Plan investments.

**THE PLANS**

18.     The MFS Defined Contribution Plan was established on July 1, 1952. The MFSavings Plan was established on January 1, 1992. Each of the Plans is governed by a written instrument commonly referred to as the "Plan Document."

19.     The Plans are "employee pension benefit plans" within the meaning of 29 U.S.C. § 1002(2)(A) and "defined contribution plans" within the meaning of 29 U.S.C. § 1002(34).

20.     The Plans are qualified plans under 26 U.S.C. § 401, and are commonly referred to as "401(k) plans."

21.     The Plans cover eligible employees and former employees of MFS or its participating subsidiaries.

22.     The Plans are defined-contribution or 401(k) plans, a type of employee retirement plan in which employees contribute a percentage of their earnings on a pre-tax basis and/or in which the employer makes contributions, either up to a certain percentage of the compensation contributed by the employee each pay period, or as a certain percentage of the employee's compensation.

23.     Throughout the relevant period, the DC Plan has served as the plan in which employer contributions are invested. Eligible employees who have been at the company for at least one year have received employer contributions in an amount equal to 15% of their base compensation each pay period.[2] The employer contributions are subject to a vesting schedule of 25% each year, with full vesting upon an employee's fifth anniversary with MFS.

---

[2] Employer contributions, along with the opportunity to participate in a defined contribution plan in the first instance, are part of a standard benefits package offered by many large employers to attract and retain talented employees. *See* 401K SPECIALIST, *Top 4 Priorities of 401(k) Plan Sponsors* (Jan. 3, 2016) (highlighting survey findings that, among large defined contribution plan

24.     Throughout the relevant period, the MFSavings Plan served as the plan in which employees could make voluntary contributions. Eligible employees could contribute anywhere between 1% and 85% of their compensation on either a pre-tax or post-tax basis, subject to IRS contribution limits.

25.     With the exception of the differences in the identity of the contributor and the vesting schedule outlined above, the Plans are materially identical. Notably, between June 30, 2011 and the filing of this Amended Complaint (the "statutory period"), both Plans' investment options were virtually identical, with MFS funds constituting the vast majority of the investment options in both Plans since at least 2011. Throughout the statutory period, both Plans were subject to the same flawed processes for selecting and monitoring investments, and both Plans utilized the same recordkeepers and compensated the recordkeepers utilizing the same methodology. In other words, the two plans operated functionally as though they were a single plan.

26.     Participants in the Plans are responsible for directing the investment of contributions, choosing from among a lineup of options offered by the Plans.[3] Because the Plans' Investment Committee determines the investment options available, the investment lineup

---

sponsors, attracting and retaining talented employees is a top priority), *available at* http://401kspecialistmag.com/top-4-priorities-of-401k-plan-sponsors; Joan Vogel, *Until Death Do Us Part: Vesting of Retiree Insurance*, 9 Indus. Rel. L.J. 183, 216 (1987) (noting that employers offer retirement benefits to attract and retain "reliable, productive employees"). ERISA is concerned with what happens next, the disposition of assets contributed. *See In re RCN Litig.*, 2006 WL 753149, at *6, n.4 (D.N.J. Mar. 21, 2006) (observing that employer contributions occur before ERISA's fiduciary duties kick in).

[3] Participants in a defined contribution plan are limited in their investment choices to the lineup of options offered by their plan. *See* INVESTMENT COMPANY INSTITUTE, *A Close Look at 401(k) Plans, 2012*, at 9 (Dec. 2014), *available at* https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "2012 ICI Study").

maintained by the Investment Committee is critical to participants' investment results and, ultimately, the retirement benefits they receive.

27.     During the statutory period, the vast majority of the Plans' designated investment alternatives have been proprietary to MFS.  Throughout the statutory period, the Plans also included options to invest in a handful of Russell LifePoints Mutual Funds ("Russell Funds"). Although these funds were not managed by MFS, an MFS affiliate served as a subadvisor for numerous funds that comprised a significant percentage of the Russell Funds. For example, in February 2012, an MFS affiliate was the subadvisor for the Russell U.S. Core Equity Fund, the Russell Global Equity Fund, and the Russell International Developed Markets Fund. These three funds alone comprised a significant percentage of every Russell Fund in the Plans: for example, they comprised approximately 43% of the Russell LifePoints 2030 Strategy Fund and more than 50% of the Russell LifePoints Equity Strategy Fund as of January 31, 2012. MFS affiliates continued to serve as subadvisor to a number of funds held by Russell Funds within the Plans until at least March 15, 2017.

## MFS AND RELATED PARTIES

*MFS*

28.     Defendant MFS is headquartered in Boston, Massachusetts. MFS is the "plan sponsor" for both Plans within the meaning of 29 U.S.C. § 1002(16)(B). MFS is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) with respect to both Plans because it is identified in the Plan Documents as having authority to control and manage the operation and administration of the Plans. MFS is also a Plan employer for both Plans. According to the Plans' Form 5500s, MFS is also the Plan Administrator, controlling and managing the operation and administration of both Plans with authority to appoint and delegate discretionary authority to an advisory

committee. Thus, MFS exercises discretionary authority or discretionary control with respect to management of the Plans, as well as discretionary authority and responsibility with respect to the administration of the Plans, and is therefore a fiduciary under 29 U.S.C. § 1002(21)(A).

29.     MFS is also a fiduciary because it has authority to appoint and remove members to the advisory committees. All members of the Retirement Committee and the Investment Committee are MFS employees who were appointed to the Committees by MFS's Board of Directors. It is well accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). 29 C.F.R. § 2509.75-8 (D-4); *Liss v. Smith*, 991 F. Supp. 278, 310-11 (S.D.N.Y. 1998); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("It is by now well-established that the power to appoint plan trustees confers fiduciary status."). The responsibility for appointing and removing members of the advisory committees carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they were complying with the terms of the Plans and ERISA's statutory standards. *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005); 29 C.F.R. § 2509.75-8 (FR-17). Furthermore, that monitoring duty carries with it a responsibility "to take action upon discovery that the appointed fiduciaries [were] not performing properly." *Liss*, 991 F. Supp. at 311.

30.     At all relevant times MFS has served as the investment manager to each of the proprietary funds held within the Plans. In exchange for these investment management services, MFS receives compensation from the Plans that is unreasonably high and comes at the expense of the Plans and their participants. At all relevant times, MFS has collected fees on a monthly basis from Plan assets invested in proprietary funds. Because MFS provides services to the Plans,

and because it is a Plan sponsor, Plan administrator, Plan employer, and Plan fiduciary with respect to both Plans, MFS is a "party in interest" under 29 U.S.C § 1002(14).

***MFSC***

31.     MFSC is a wholly owned subsidiary of MFS. MFSC provides shareholder servicing functions, acts as transfer agent and dividend-paying agent for proprietary funds in the Plans, and receives unreasonably high compensation from MFS for providing these services to the Plans. MFSC is also a Plan employer. As a participating employer in the Plans and a party that provides services to the investments held by the Plans, MFSC is a "party in interest" under 29 U.S.C. § 1002(14).

32.     Many employees of MFSC and MFSC management have dual roles whereby they also work or hold leadership positions for MFS. For example, Robert J. Manning, Co-CEO and Chairman of MFS, is currently a Director on MFSC's Board. Mark N. Polebaum, MFS's General Counsel who is responsible for all aspects of MFS's legal and compliance operations, is currently Secretary for both companies. Robin A. Stelmach, currently the Vice Chair of MFS, formerly served as Chief Operating Officer of MFS while simultaneously overseeing MFSC. MFSC and MFS are also headquartered at the same address. Given the interconnected nature and operations of MFSC and MFS, MFSC possessed all actual and constructive knowledge possessed by MFS. Pursuant to this knowledge, and the knowledge it gained through its role as a Plan employer and service provider for the designated investment alternatives held by the Plans, MFSC had actual and constructive knowledge of the conduct of the other Defendants, and the fact that the revenues that MFSC received directly or indirectly from Plan assets were the product of Defendants' fiduciary breaches.

*The Committees and Committee Members*

33.     MFS delegated a portion of its fiduciary responsibilities for investing Plan assets

to the Investment Committee. The Investment Committee is responsible for maintaining the

Plans' investment lineups, including monitoring the Plans' designated investment alternatives

and making changes, as appropriate. The Investment Committee is a functional fiduciary

pursuant to 29 U.S.C. § 1002(21)(A) given this discretionary authority. The Investment

Committee is also a named fiduciary pursuant to 29 U.S.C. § 1102(a) because it is identified in

the Plan Documents as having responsibility for selecting, monitoring, and changing the Plans'

investment lineup. The members of the Investment Committee are senior-level professional

employees or officers of MFS. At all times, they were acting within the scope of their

employment or agency with MFS.

34.     MFS also delegated its fiduciary responsibility for administering the Plans to the

Retirement Committee. The Retirement Committee is responsible for, among other things,

amending the Plan Documents, construing the Plans, selecting recordkeepers, and determining

recordkeeper compensation. The Retirement Committee is a functional fiduciary pursuant to 29

U.S.C. § 1002(21)(A) given its discretionary authority in the administration of the Plans. The

Retirement Committee is also a named fiduciary pursuant to 29 U.S.C. § 1102(a) because it is

identified in the Plan Documents as having responsibility for administration of the Plans. The

members of the Retirement Committee are senior-level professional employees or officers of

MFS. At all times, they were acting within the scope of their employment or agency with MFS.

35.     Any individuals or entities to whom Defendants delegated any fiduciary functions

or responsibilities are also fiduciaries of the Plans pursuant to 29 U.S.C. §§ 1002(21)(A) and

1105(c)(2).

36.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

37.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     for the exclusive purpose of
>
> (i)     providing benefits to participants and their beneficiaries; and
>
> (ii)    defraying reasonable expenses of administering the plan;
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

38.     These ERISA fiduciary duties are "the highest known to the law." *Braden*, 588 F.3d at 598 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

### DUTY OF LOYALTY

39.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quoting G Bogert et al., *Law of Trusts and Trustees* § 543

(rev. 2d ed. 1980)). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . ." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

40.    While ERISA does not prohibit an employer's corporate officers or high-level employees from serving as plan fiduciaries—basically wearing two hats—it does require that they "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225. For example, in administering an ERISA plan, corporate officers must "avoid placing themselves in a position where their acts [or interests] as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of the pension plan." *Donovan*, 680 F.2d at 271. "A fiduciary with a conflict of interest must act as if he is 'free' of such a conflict. 'Free' is an absolute. There is no balancing of interests; ERISA commands undivided loyalty to the plan participants." *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 154 (4th Cir. 1996).

41.    "The presence of conflicting interests imposes on fiduciaries the obligation to take precautions to ensure that their duty of loyalty is not compromised." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 299 (5th Cir. 2000). "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in intensive and scrupulous independent investigation of their options to insure that they act in the best interests of plan beneficiaries.'" *Howard v. Shay*, 100 F.3d 1484, 1488–89 (9th Cir. 1996) (quoting *Leigh v. Engle*, 727 F.2d 133, 125–26 (7th Cir. 1984)).

**DUTY OF PRUDENCE**

42.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent.  *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)). Therefore, "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Krueger v. Ameriprise Fin., Inc.*, No. 11-CV-02781, 2012 WL 5873825, at *14 (D. Minn. Nov. 20, 2012) (quoting *DiFelice*, 497 F.3d at 423).

43.    Failing to closely monitor and subsequently minimize administrative expenses (by, for example, failing to survey the competitive landscape and failing to leverage the plan's size to reduce fees), constitutes a breach of fiduciary duty. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Similarly, selecting and retaining higher-cost investments because they benefit a party in interest constitutes a breach of fiduciary duties when similar or identical lower-cost investments are available. *Braden*, 588 F.3d at 596.

15

44.     Although ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan," that duty exists only "insofar as such documents and instruments are consistent with" the other duties imposed upon fiduciaries by ERISA.  29 U.S.C. § 1104(a)(1)(D).  "This provision makes clear that the duty of prudence trumps the instructions of a plan document . . . ." *Dudenhoeffer*, 143 S. Ct. at 2468.

### PROHIBITED TRANSACTIONS

45.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106. These transactions are considered "*per se*" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C)     furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

Section 1106(b) further provides, in pertinent part:

A fiduciary with respect to the plan shall not –

> (1)     deal with the assets of the plan in his own interest or for his own account,
>
> (2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or
>
> (3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

### SOURCE AND CONSTRUCTION OF DUTIES

46.     The Supreme Court has noted that the legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828. Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.* In fact, the duty of prudence imposed under 29 U.S.C. § 1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

47.     Pursuant to the prudent investor rule, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also id.* § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function . . . ."). The Introductory Note to the Restatement's chapter on trust investment further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market-efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled-investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs . . . that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

*Id.*, ch. 17, intro. note (2007). Where markets are efficient, fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to increase general transaction costs . . . . [T]hese

added costs . . . must be justified by realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

48.     In considering whether a fiduciary has breached the duties of prudence and loyalty, the Court considers both the "merits of the transaction" as well as "the thoroughness of the investigation into the merits of the transaction." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 288 (D. Mass. 2008) (quoting *Howard*, 100 F.3d at 1488). Mere "subjective good faith" in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

## CO-FIDUCIARY LIABILITY

49.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. § 1105(a) states, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> >
> > (2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

50.     In a defined-contribution plan, fiduciaries are obligated to assemble a diversified menu of investment options. 29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii). Plan

participants may invest in any of these "designated investment alternatives" that fiduciaries include within the plan's menu of investment options.[4]

51.    Each investment alternative within a defined contribution plan is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class. 2012 ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").

52.    The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate. Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the default risk associated with the particular borrower. Equity (or "stock") investments obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company. Equity investments are generally defined by three characteristics: (1) where the investment managers invest geographically (*i.e.*, whether they invest in domestic or international companies, or both); (2) the size of companies they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, *i.e.* growth, value, or blend (growth funds invest in fast-growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds

---

[4] A "designated investment alternative" is defined as "any investment alternative designated by the plan into which participants . . . may direct the investment of assets held in, or contributed to, their individual accounts." 29 C.F.R. § 2550.404a-5(h)(4).

invest in a mix of growth stocks, value stocks, and companies in between). Balanced funds are a type of mutual fund that invests in a mix of stocks and bonds. Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

53.     Every pooled investment product charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis. For example, within each of the MFS funds within the Plans, monthly management fees are paid to Defendant MFS. MFS then uses a portion of this fee to pay its affiliate, MFSC, for its services as a transfer agent and dividend-paying agent for the funds. According to the Plans' Form 5500s, MFS also uses a portion of this fee to pay the Plans' recordkeeper.

54.     Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential typically is not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), *available at*

http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

### MINIMIZATION OF PLAN EXPENSES

55.     At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Accordingly, poor investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, Stacy Schaus, *Defined Contribution Plan Sponsors Ask Retirees, "Why Don't You Stay?" Seven Questions for Plan Sponsors*, PIMCO (Nov. 2013), https://www.pimco.com/insights/investment-strategies/featured-solutions/defined-contribution-plan-sponsors-ask-retireeswhy-dont-you-stay-seven-questions-for-plan-sponsors (explaining that "a reduction in [annual] fees from 100 bps[5] to 50 bps [within a retirement plan] could extend by **several years** the potential of participants' 401(k)s to provide retirement income") (emphasis added); U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

56.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. Investment Company Institute & Deloitte Consulting LLP, Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013, at

---

[5] The term "bps" is an abbreviation of the phrase "basis points." One basis point is equal to .01%, or 1/100th of a percent. Thus, a fee level of 100 basis points translates into fees of 1% of the amount invested. *See* Investopedia, Definition of 'Basis Point (BPS)', http://www.investopedia.com/terms/b/basispoint.asp (last accessed May 24, 2017).

17 (Aug. 2014), *available at* https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study").  Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.*

57.    Administrative expenses (*e.g.*, recordkeeping, trustee and custodial services, accounting, etc.) can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. These "revenue sharing" payments from investment managers to plan service providers typically happen on a monthly or quarterly basis and are determined by an agreed-upon contribution formula. Although revenue sharing arrangements are not necessarily prohibited transactions under 29 U.S.C. § 1106(b), plan fiduciaries "must act prudently and solely in the interest of plan participants and beneficiaries both in deciding whether to enter into, or continue, [a revenue sharing arrangement] and in determining the investment options in which to invest or make available to plan participants and beneficiaries in self-directed plans." U.S. Dep't of Labor, DOL Advisory Opinion 2003-09A, 2003 WL 21514170, at *6 (June 25, 2003).

58.    Prudent fiduciaries exercising control over administration of the plan and the selection and monitoring of core investment options will minimize plan expenses by hiring low-cost service providers and by curating a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to

institutional investors or by negotiating directly with the investment manager to obtain a lower

fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings:*

*Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), *available at*

http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm

(instructing employees of large corporations that "[y]our employer should be able to use its size

to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of*

*401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), *available at*

https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and

similar instruments, "[t]otal investment management expenses can commonly be reduced to one-

fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out.

In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied

between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of

only 0.44% for plans with between $500 million and $1 billion in assets. 2012 ICI Study at 41.

59.     Given the significant variation in total plan costs attributable to plan size, the

reasonableness of administrative expenses and investment management expenses should be

determined by comparisons to other similarly-sized plans. *See* 29 U.S.C. § 1104(a)(1)(B)

(requiring ERISA fiduciaries to discharge their duties in the manner "that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a

like character") (emphasis added); *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D.

Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of

the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007

WL 4289694, at *6, n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and

investment expenses were unreasonable through comparisons to similar plans because "[a]t most,

reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

## MANAGEMENT OF THE PLAN'S INVESTMENT OPTIONS

60.     With respect to designing the menu of investment options, a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan and monitoring the plan's existing investments.

61.     The first critical insight is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. Plan participants often engage in "naive diversification," whereby they attempt to diversify their holdings simply by spreading their money among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. PA. L. REV. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H. Thaler, *Naive Diversification Strategies in Defined Contribution Plans*, 91 AM. ECON. REV. 79, 96 (2001). Indeed, in a February 2014 survey performed by MFS, 74% of participants surveyed stated that having a little bit invested in each option of a 401(k) plan is the best way to diversify. Commenting on the survey, Ravi Venkataraman, MFS's global head of Consultant Relations and Defined Contribution, stated that many 401(k) participants are "ill-equipped to make well-informed decisions" about their investments.

62.     Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years). For all of these reasons, prudent fiduciaries will limit their menus to only those funds that represent sound long-term investments and will remove imprudent investments rather than relying on participants to move their money out of an imprudent investment.  The fact that participants exercise "independent control" over the assets in their accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any … designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(1)(iv).

63.     The second critical insight provided by academic and financial industry literature is that in selecting prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper Is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper Is Better*"); *see also* Fisch & Wilkinson-Ryan, *Costly*

*Mistakes*, at 1993 (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").  As one scholarly article notes:

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper Is Better*, at 883.

64.     While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring 31 years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). Any sustainable ability to beat the market that managers might demonstrate is dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor

should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

65.     Mutual fund companies possess no special insight that allows them to identify which of their own funds are likely to outperform in the future. Though mutual fund companies acting as service providers tend to favor retention of their own funds, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. OF FIN. 1779 (Aug. 2016). A study of third-party administrators similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns are attributable to the use of proprietary mutual funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. OF FIN. RES. 5 (Spring 2016).

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PLANS

### I.     DEFENDANTS USED A DISLOYAL AND IMPRUDENT PROCESS TO MANAGE THE PLANS.

66.     MFS is a manufacturer of financial products, primarily mutual funds, collective investment trusts, and separate accounts. It sells these products to a variety of individual and institutional investors, including retirement plans and their participants. As of the end of June 2016, MFS managed approximately $44 billion in assets within defined contribution plans, representing less than 1% of total defined contribution plan assets, and over ten times less than the amounts managed by Vanguard and Fidelity, the two largest asset management companies. PENSION & INVESTMENTS, *Vanguard Pads Lead Over Fidelity as Largest Manager of DC Mutual*

*Fund          Assets*          (Oct.          17,          2016),          available          at
http://www.pionline.com/article/20161017/PRINT/161019925/vanguard-pads-lead-over-fidelity-
as-largest-manager-of-dc-mutual-fund-assets; INVESTMENT COMPANY INSTITUTE, *Retirement
Assets Total $25.3 Trillion in Fourth Quarter 2016* (Mar. 22, 2017), *available at*
https://www.ici.org/research/stats/retirement/ret_16_q4.

67.     According to Form 5500 filings with the Department of Labor, approximately
83% of the 3,201 defined contribution plans with $200 million or more in assets as of the end of
2015 held no MFS-affiliated products. Among the remaining 17% of plans that held an MFS-
affiliated product, the average plan held less than 4% of its assets in MFS-affiliated investments,
with no plan (other than the Plans) holding over 50% of its assets in MFS-affiliated investments.

68.     In contrast to the remainder of the defined contribution plan landscape,
throughout the relevant period over 98% of the Plans' investable assets were held in MFS-
affiliated investments. The reason for this is simple—throughout this period of time, the vast
majority of designated investment alternatives offered within the Plans have been MFS-affiliated
investments.

69.     For example, in 2015, the Plans offered 76 designated investment alternatives, 60
of which were proprietary MFS mutual funds. By the end of 2015, approximately 99.5% of the
Plans' assets were invested in MFS proprietary funds.  Over a quarter of these 60 funds were not
held by *a single one* of the 3,201 defined contribution plans with over $200 million in assets as
of the end of 2015 (except for the Plans).[6]

---

[6] Five years earlier, in 2010, Plan participants were offered 47 proprietary mutual funds, 9
mutual funds from Russell Investment Management Company ("Russell"), and a collective trust
stable value fund. At the end of 2010, approximately 98.7% of the Plans' assets were invested in
MFS proprietary funds.

70.     As of the end of 2015, MFS only offered 70 mutual funds to the public (excluding municipal bond funds).[7]  Thus, not only did the Plan's investment menu consist mostly of MFS proprietary funds, but MFS included the vast majority of its proprietary funds in the Plan.[8]

71.     During the relevant period, the Investment Committee did not remove a single MFS fund from the Plan, and the Investment Committee did not meaningfully monitor the existing MFS funds in the Plans, in derogation of its fiduciary duties.

72.     The sixty different MFS funds in the Plans as of the end of 2015 did not each offer a unique asset class exposure or investment style to participants; instead, a significant number of these offerings were duplicative of other MFS funds in the Plans. For example, as of the end of 2015, the Plans' lineup contained twelve large company domestic equity mutual funds, four global large company equity mutual funds, and five international large company equity mutual fund offerings. While it might be a good business strategy to have multiple overlapping options, it is harmful to plan participants. Studies of participant behavior have shown that offering numerous, overlapping investment choices tends to confuse participants, hampering participants' ability to make good decisions while implicitly encouraging them to engage in counter-productive performance chasing.[9] Further, because the extraneous funds added

---

[7] Municipal bond interest payments are federal tax-free, and because of this feature, municipal bonds offer lower yields than taxable bonds with comparable maturities and credit quality. Municipal bonds are therefore generally considered inappropriate investments for retirement plan accounts, which do not enjoy these tax benefits due to their already tax-deferred nature. *See* THE MOTLEY FOOL, *Two Investments to Avoid in Your IRA* (Feb. 24, 2015), available at https://www.fool.com/investing/general/2015/02/24/2-investments-to-avoid-in-your-ira.aspx.

[8] Of the 10 proprietary non-municipal bond mutual funds that MFS offers to the public not present in the Plans by the end of 2015, 6 have inception dates of September, 2015.

[9] Sheena S. Iyengar & Emir Kamenica, *Choice Proliferation, Simplicity Seeking, and Asset Allocation*, 94 J. OF PUB. ECON. 530-39 (2010); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments*, T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009) ("Offering too many

to a plan tend to have higher expenses, the presence of duplicative investment offerings is directly correlated in a statistically significant manner with an increase in the overall investment fees within the Plans. Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 YALE L.J. 1476, 1542-43 (Mar. 2015).

73.   Even among the non-overlapping MFS mutual funds in the Plans, several of the proprietary MFS funds were structurally imprudent. For example, sector funds that invest in a specific industry typically reduce, rather than enhance, a portfolio's level of diversification. Such funds also encourage speculation and return-chasing by participants, behavioral tendencies that studies have shown tend to result in negative performance outcomes. Despite these issues, throughout the relevant period the Plan has retained the MFS Utilities[10] and MFS Technology mutual funds, without performing any investigation or review of the options to determine

---

choices to consumers can lead to decision paralysis, preventing consumers from making decisions."), *available                                        at* http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

[10] Traditionally, utilities stocks have been viewed as a conservative investment that could provide investors with high current yield, the potential for appreciation, and lower volatility than other segments of the stock market. This notion has been proven wrong by modern portfolio theory, which demonstrates that a concentrated investment in a particular industry or issue exposes an investor to a unique set of risks that can be substantially mitigated through diversification. For example, owning a concentrated portfolio of utility stocks might expose an investor to heightened risks related to energy prices, regulatory change, and interest rate hikes that can be substantially mitigated through diversification. Further, to the extent that it remains possible for a utility fund to serve its traditional purposes as a conservative equity investment, the MFS Utilities Fund is not an appropriate fund for that purpose. As Morningstar recently explained, the Fund invests significantly in more volatile areas such as media, telecommunications, and energy stocks. Further, the manager invests heavily in foreign stocks, including significant stakes in Russian and Chinese energy outfits. These risky investments have led to significant volatility, with the fund dropping 38% in value in 2008, for example, while dropping over 14% in 2015. Thus, the MFS Utilities Fund has no viable role in a 401(k) menu as a conservative haven within the equity markets. Instead, it suffers from the same flaws that plague other sector funds related to reduced diversification, exposure to industry-specific risks, and encouraging speculative investment behavior.

whether their inclusion in the Plans was in fact benefiting participants. Such a review would have revealed that these two funds are not properly designed to assist participants in achieving the goals of the Plans.

74.     The proprietary MFS funds in the Plans were not the only investments that benefited MFS. Most of the non-proprietary funds in the Plans also were included because they would benefit MFS. Until 2015, all of the non-proprietary mutual funds offered as designated investment alternatives in the Plans were Russell Funds. Russell's mutual funds use a subadvisory approach in which the Frank Russell Company hires various subadvisors to manage the assets within its mutual funds. Not coincidentally, a wholly owned subsidiary of MFS has served as a subadvisor to several Russell Funds during the majority of the statutory period.

75.     MFS's inclusion of the Russell Funds in the Plans was not the product of a prudent or impartial process. The Russell funds added to the Plan were duplicative of other offerings in the Plan, had high fees, and had been generally rejected by other defined contribution plans. As of the end of 2015, the Plans were the only two defined contribution plans (out of over 3,000 with more than $200 million in assets) to offer any of the Russell funds included within the Plans at the time. The inclusion of Russell mutual funds benefitted MFS both through the payment of investment management fees and by furthering MFS's relationship with the Russell companies. Given the high fees and consistently poor performance of the Russell Funds, their inclusion in the Plan benefited MFS's own interests rather than the interests of Plan participants.

76.     In 2015, MFS added three Vanguard funds—the Vanguard 500 Index Fund, Vanguard Total Bond Market Index Fund, and Vanguard Total International Stock Fund—to the

Plans. However, MFS did not remove a single one of its proprietary funds from the Plans when it added the Vanguard funds. To the contrary, MFS added four more MFS funds to the Plans.

77.     Defendants were obligated to conduct a thorough investigation of each fund, and only include or retain funds in the Plans if the inclusion or retention of each fund was prudent and in the best interest of the Plans' participants. *See* Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (explaining that the "decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan") (emphasis added). A prudent and loyal process is objective and thorough; such a process considers a wide range of investment options available in the marketplace both in the process of selecting designated investment alternatives and in reviewing those investments. *See* Restatement (Third) of Trusts § 78 cmt. c(8) (2007) (to select mutual fund affiliated with the trustee, trustee "must be sufficiently aware of overall costs associated with other mutual fund alternatives to enable the trustee to fulfill its important responsibility to be cost conscious"); Restatement (Third) of Trusts § 90 cmt. m (2007) (emphasizing the need for fiduciaries to make "careful overall cost comparisons" when selecting trust investments, "particularly among similar products of a specific type being considered for a trust portfolio").

78.     Defendants' process for managing the Plans was neither prudent nor loyal. At all stages, both in selecting the Plans' designated investment alternatives and in monitoring those investments, Defendants' primary consideration was to maximize the amount of Plan assets invested in funds affiliated with MFS, in furtherance of their own financial interests rather than the interests of Plan participants. In so doing, Defendants breached the fiduciary duties they owed to Plan participants.

II.   **DEFENDANTS RETAINED HIGH-COST PROPRIETARY FUNDS IN THE PLANS IN THEIR OWN SELF INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS**

79.     Because the Plans are laden with high-cost, proprietary mutual funds managed by MFS, and Defendants failed to investigate lower-cost, nonproprietary alternatives and remove the high-cost MFS funds, the Plans' expenses are significantly higher than other comparable retirement plans.[11]

80.     For example, taking into account all administrative and investment expenses within the Plans, and using 2012 year-end balances and publicly available information regarding each investment's expenses, estimated total Plan costs for 2012 were approximately $4,416,791, or 0.86% of the more than $515 million in assets within the Plans. Using the same data sets, estimated total Plan costs for 2014 were approximately $5,366,667, or 0.80% of the more than $670 million in assets within the Plans.

81.     The Plans' total costs are extremely high for defined-contribution plans with a similar amount of assets. For example, in 2012, the median total plan cost for plans with between $500 million and $1 billion in assets[12] was 0.45%, compared to 0.86% for the Plans, approximately three standard deviations above the median. 2012 ICI Study at 41-42. In 2014, the median total plan cost for plans of this size was 0.44%, compared to 0.80% for the Plans,

---

[11] Compounding this problem, Defendants also failed to include the least expensive share class of certain proprietary funds in the Plans, caused the Plans to pay excessive recordkeeping costs, and failed to consider separate accounts and collective trusts as alternatives to mutual funds. *See infra* at §§ III-V.

[12] Because the Plans essentially operated as a single plan and had the negotiating power of a plan with the combined assets of both Plans, the Plans' combined assets should be utilized when comparing their average expense ratio to that of other, similarly sized plans. However, even if the Plans were each compared independently to other plans of a similar size, the Plans' expenses were still excessive. For example, in 2012, the median total plan costs for plans with assets in the $250 to $500 million range were 0.49%, and in the $100 million to $250 million range were 0.57%.

approximately 2.6 standard deviations above the median. INVESTMENT COMPANY INSTITUTE, *The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014* (Dec. 2016), at 49, available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "2014 ICI Study").[13] Thus, in 2012 the Plans were approximately 91% more expensive than the median similarly sized plan, and in 2014 they were 82% more expensive.

82.     These comparisons of overall Plan costs actually understate the excessiveness of the investment management fees paid by the Plans' participants. The fees charged by the MFS funds in the Plans were generally many times higher than the fees in comparable institutional mutual funds that were frequently used by other plans. As shown by the chart below, the fees for funds[14] within the Plans as of year-end 2015 (as disclosed in the Plans' 2015 Form 5500) were *up to 30 times higher* than passively-managed alternatives in the same investment style, and *up to 4 times higher* than actively-managed alternatives in the same investment style that would have provided comparable investment management services. Indeed, for every fund in the Plans, with the exception of the three Vanguard funds added in 2015, there was a fund available from outside the MFS family with significantly lower expenses (and in nearly every case, less expensive passively-managed *and* actively-managed funds were available):

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Absolute Return Fund R6 (MRNVX) | 85 bps | Vanguard Short-Term Bond Index Adm (VBIRX) | 7 bps | JPMorgan Unconstrained Debt R5 (JSIRX) | 50 bps | Non-traditional Bond |

---

[13] Standard deviation was calculated using the median and the 10th and 90th percentile averages, assuming a normal distribution. 2012 ICI Study at 42; 2014 ICI Study at 50.

[14] Because each of the Russell Funds in the Plans is duplicative of at least one of the MFS mutual funds in the Plan, and in every case the Russell option had higher fees than the comparable MFS fund, Plaintiffs have omitted comparators for the Russell Funds from the chart.

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Aggressive Growth Allocation Fund I (MIAGX) | 87 bps | Vanguard Total World Stock Idx I (VTWIX) | 10 bps | American Funds Growth & Inc Portfolio R6 (RGNGX) | 39 bps | Asset Allocation – 85%+ Equity |
| MFS Blended Research Core Equity Fund R6 (MUEVX) | 42 bps | Fidelity Spartan 500 Index Inst (FXSIX)  BNY Mellon Stock Index Fund CIT | 3.5 bps  3 bps | American Funds Fundamental Investor R6 (RFNGX)  Vanguard Growth & Inc Adm (VGIAX) | 31 bps  23 bps | Large Blend |
| MFS Corporate Bond R6 (MFBKX) | 46 bps | Vanguard Interm-Term Corp Bond Index Inst (VICBX) | 5 bps | Vanguard Interm-Term Inv-Grade Adm (VFIDX) | 10 bps | Corporate Bond |
| MFS Conservative Allocation Fund I (MACIX) | 69 bps | Vanguard LifeStrategy Conservative Growth Inv (VSCGX) | 13 bps | Vanguard Wellesley Income Adm (VWIAX) | 15 bps | Asset Allocation —30 to 50% Equity |
| MFS Core Equity Fund R6 (MRGKX) | 72 bps | Fidelity Spartan 500 Index Inst (FXSIX)  BNY Mellon Stock Index Fund Instl CIT | 3.5 bps  3 bps | American Funds Fundamental Investor R6 (RFNGX)  Vanguard Growth & Inc Adm (VGIAX) | 31 bps  23 bps | Large Blend |
| MFS Diversified Income Fund R6 (DIFHX) | 68 bps | Vanguard LifeStrategy Conservative Growth Inv (VSCGX) | 13 bps | Vanguard Wellesley Income Adm (VWIAX) | 15 bps | Asset Allocation —30% to 50% Equity |
| MFS Emerging Markets Debt Fund R6 (MEDHX) | 74 bps | Vanguard Emerging Markets Gov't Bond Idx Inst (VGIVX) | 29 bps | GMO Emerging Country Debt III (GMCDX) | 54 bps | Emerging Markets Bond |
| MFS Emerging Markets Debt Local Currency Fund R6 (EMLNX) | 84 bps | Vanguard Emerging Mkts Govt Bond Idx Inst (VGIVX) | 29 bps | GMO Emerging Country Debt III (GMCDX) | 54 bps | Emerging Markets Bond |

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Emerging Markets Equity Fund R6 (MEMJX) | 129 bps | Vanguard Emerging Markets Stock Index Inst (VEMIX) | 11 bps | American Funds New World R6 (RNWGX) | 65 bps | Emerging Markets Equity |
| MFS Equity Income Fund R6 (EQNVX) | 71 bps | TIAA-CREF Large-Cap Value Idx I (TILVX)<br><br>BNY Mellon Large Cap Value Stock Index Fund Instl | 6 bps<br><br>3.7 bps | American Funds American Mutual Fund R6 (RMFGX)<br><br>Vanguard Equity Income Adm (VEIRX) | 30 bps<br><br>17 bps | Large Value |
| MFS Equity Opportunities R6 (SRFHX) | 85 bps | Fidelity Spartan Mid Cap Idx Premier (FSCKX) | 7 bps | DFA U.S. Core Equity II Portfolio I (DFQTX) | 22 bps | Mid-Cap Blend |
| MFS Global Alternative Strategy Fund R6 (DVRLX) | 112 bps | Vanguard LifeStrategy Growth Inv (VASGX) | 15 bps | AQR Style Premia Alternative LV R6 (QSLRX) | 85 bps | Multi-alternative |
| MFS Global Bond Fund R6 (MGBOX) | 74 bps | Vanguard Total Int'l Bond Idx Adm (VTABX) | 12 bps | Templeton Global Bond R6 (FBNRX) | 52 bps | World Bond |
| MFS Global Equity Fund R6 (MWEMX) | 88 bps | Vanguard Total World Stock Index Inst (VTWIX) | 10 bps | DFA Global Equity I (DGEIX)<br><br>Amer Funds Capital World Grwth & Inc R6 (RWIGX) | 30 bps<br><br>45 bps | World Stock |
| MFS Global Growth Fund R6 (MWOKX) | 108 bps | Vanguard Total World Stock Index Inst (VTWIX) | 10 bps | American Funds New Perspective R6 (RNPGX) | 45 bps | World Stock |
| MFS Global High Yield R6 (MHOVX) | 75 bps | SSgA US High Yield Bond Index CIT[15] | 8 bps | AB High Income I (AGDIX) | 53 bps | High Yield Bond |

---

[15] Estimated based on Form 5500 filings for the collective investment trust.

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Global Multi Asset R6 (GLMVX) | 120 bps | Vanguard LifeStrategy Moderate Growth Inv (VSMGX)<br><br>Northern Trust Global Balanced Fund NL CIT | 14 bps<br><br>18 bps | American Funds Global Balanced R6 (RGBGX) | 54 bps | World Allocation |
| MFS Global New Discovery Fund R6 (GLNNX) | 122 bps | Vanguard Total World Stock Index Inst (VTWIX) | 10 bps | American Funds SMALLCAP World R6 (RLLGX) | 71 bps | World Stock |
| MFS Global Total Return Fund R6 (MFWLX) | 78 bps | Vanguard LifeStrategy Moderate Growth Inv (VSMGX) | 14 bps | American Funds Capital Income Builder R6 (RIRGX) | 30 bps | World Allocation |
| MFS Government Securities Fund R6 (MFGKX) | 52 bps | Vanguard Interm-Term Gov't Bond Idx Adm (VSIGX)<br><br>SSgA U.S. Intermediate Government/Credit Bond Index NL Series CIT | 7 bps<br><br>8 bps | DFA Intermediate Gov't Fixed Income I (DFIGX) | 12 bps | Interm. Gov't Bond |
| MFS Growth Allocation Fund I (MGWIX) | 80 bps | Vanguard LifeStrategy Growth Inv (VASGX) | 15 bps | American Funds Income Fund of America R6 (RIDGX) | 28 bps | Asset Allocation – 70 to 85% Equity |
| MFS Growth Fund R6 (MFEKX) | 62 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>BNY Mellon Large Cap Growth Stock Index Fund CIT | 6 bps<br><br>4 bps | American Funds Growth Fund of America R6 (RGAGX)<br><br>Vanguard PRIMECAP Adm (VPMAX) | 33 bps<br><br>33 bps | Large Growth |
| MFS High Income R6 (MHIKX) | 61 bps | SSgA US High Yield Bond Idx CIT | 8 bps | Vanguard High Yld Corp Adm (VWEAX) | 13 bps | High Yield Bond |
| MFS Inflation-Adjusted Bond Fund R6 (MIAKX) | 60 bps | Fidelity Inflation-Protected Bond Index Premium (FSIYX) | 9 bps | Vanguard Inflation-Protected Secs Adm (VIPIX) | 10 bps | Inflation-Protected Bond |

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Institutional International Equity I (MIEIX) | 71 bps | Vanguard Total Int'l Stock Index Inst (VTSNX) | 9 bps | American Funds Europacific Growth R6 (RERGX) | 50 bps | Foreign Large Growth |
| MFS International Diversification Fund I (MDIJX) | 93 bps | Fidelity Spartan Int'l Idx Inst (FSPNX)<br><br>BNY Mellon International Stock Index Fund CIT | 6 bps<br><br>7 bps | Dodge & Cox International Stock (DODFX) | 64 bps | Foreign Large Blend |
| MFS International Growth Fund R6 (MGRDX) | 84 bps | Vanguard Total Int'l Stock Index Inst (VTSNX) | 9 bps | American Funds Europacific Growth R6 (RERGX) | 50 bps | Foreign Large Growth |
| MFS Int'l New Discovery Fund R6 (MIDLX) | 96 bps | Vanguard FTSE All-World ex-US Small Cap Index Inst (VFSNX) | 12 bps | DFA Int'l Small Cap Growth (DISMX) | 55 bps | Foreign Small/Mid Growth |
| MFS International Value Fund R6 (MINJX) | 66 bps | Schwab Fundamental Int'l Large Co. Index (SFNNX) | 25 bps | DFA International Core Equity I (DFIEX) | 30 bps | Foreign Large Value |
| MFS Lifetime 2015 Fund I (LFTIX) | 59 bps | Vanguard Target Retirement 2015 Investor | 14 bps | American Funds 2015 Target Date Retire R6 (RFJTX) | 35 bps | Target Date 2015 |
| MFS Lifetime 2020 Fund I (MFLEX) | 62 bps | Vanguard Target Retirement 2020 Investor (VTWNX) | 14 bps | American Funds 2020 Target Date Retire R6 (RRCTX) | 37 bps | Target Date 2020 |
| MFS Lifetime 2025 Fund I (LTTIX) | 67 bps | Vanguard Target Retirement 2025 Investor (VTTVX) | 14 bps | American Funds 2025 Target Date Retire R6 (RFDTX) | 39 bps | Target Date 2025 |
| MFS Lifetime 2030 Fund I (MLTIX) | 71 bps | Vanguard Target Retirement 2030 Fund Investor (VTHRX) | 15 bps | American Funds 2030 Target Date Retire R6 (RFETX) | 41 bps | Target Date 2030 |

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Lifetime 2035 Fund I(LFEDX) | 73 bps | Vanguard Target Retirement 2035 Fund Investor (VTTHX) | 15 bps | American Funds 2035 Target Date Retire R6 (RFFTX) | 42 bps | Target Date 2035 |
| MFS Lifetime 2040 Fund I(MLFIX) | 74 bps | Vanguard Target Retirement 2040 Fund Investor (VFORX) | 16 bps | American Funds 2040 Target Date Retire R6 (RFGTX) | 43 bps | Target Date 2040 |
| MFS Lifetime 2045 Fund I (LTMKX) | 74 bps | Vanguard Target Retirement 2045 Fund Investor (VTIVX) | 16 bps | American Funds 2045 Target Date Retire R6 (RFHTX) | 43 bps | Target Date 2045 |
| MFS Lifetime 2050 Fund I (MFFIX) | 74 bps | Vanguard Target Retirement 2050 Fund Investor (VFIFX) | 16 bps | American Funds 2050 Target Date Retire R6 (RFITX) | 43 bps | Target Date 2050 |
| MFS Lifetime 2055 Fund I (LFIIX) | 73 bps | Vanguard Target Retirement 2055 Fund Investor (VFFVX) | 16 bps | American Funds 2055 Target Date Retire R6 (RFKTX) | 45 bps | Target Date 2055 |
| MFS Lifetime Income Fund I (MLLIX) | 59 bps | Vanguard Target Retirement Income Investor (VTINX) | 13 bps | JPMorgan SmartRetirement Blend Income R6 (JIYBX) | 29 bps | Target Date Income |
| MFS Limited Maturity Fund R6 (MQLKX) | 52 bps | Vanguard Short-Term Bond Index Adm (VBIRX) | 7 bps | DFA Short-Term Extended Quality I (DFEQX) | 22 bps | Short-Term Bond |
| MFS Low Volatility Equity R6 (MLVTX) | 91 bps | Fidelity Spartan 500 Index Inst (FXSIX)

BNY Mellon Large Cap Stock Index CIT | 3.5 bps

3 bps | American Funds Fundamental Investor R6 (RFNGX)

Vanguard Growth & Inc Adm (VGIAX) | 31 bps

23 bps | Large Blend |
| MFS Low Volatility Global R6 (MVGNX) | 95 bps | Vanguard Total World Stock Index Inst (VTWIX) | 10 bps | American Funds Capital World Grwth & Inc R6 (RWIGX) | 45 bps | World Stock |

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Managed Wealth I (MNWIX) | 121 bps | Vanguard Short-Term Bond Index Adm (VBIRX) | 7 bps | Diamond Hill Long-Short Y (DIAYX) | 100 bps | Long-Short Equity |
| MFS Massachusetts Investors Growth Stock Fund R6 (MIGNX) | 38 bps | TIAA-CREF Large-Cap Growth Idx I (TILIX)<br><br>BNY Mellon Large Cap Growth Stock Index CIT | 6 bps<br><br>4 bps | American Funds Growth Fund of America R6 (RGAGX)<br><br>Vanguard PRIMECAP Adm (VPMAX) | 33 bps<br><br>33 bps | Large Growth |
| MFS Massachusetts Investors Trust R6 (MITJX) | 39 bps | Fidelity Spartan 500 Index Inst (FXSIX)<br><br>BNY Mellon Large Cap Stock Index Fund CIT | 3.5 bps<br><br>3 bps | American Funds Fundamental Investor R6 (RFNGX)<br><br>Vanguard Growth & Inc Adm (VGIAX) | 31 bps<br><br>23 bps | Large Blend |
| MFS Mid Cap Value Fund R6 (MVCKX) | 75 bps | Vanguard Mid-Cap Value Index Adm (VMVAX) | 7 bps | Vanguard Selected Value Inv (VASVX) | 35 bps | Mid-Cap Value |
| MFS Mid-Cap Growth Fund R6 (OTCKX) | 88 bps | Vanguard Mid-Cap Growth Index Adm (VMGMX) | 7 bps | Fidelity Mid-Cap Stock K (FKMCX) | 60 bps | Mid-Cap Growth |
| MFS Moderate Allocation Fund I (MMAIX) | 74 bps | Vanguard LifeStrategy Moderate Growth Inv (VSMGX) | 14 bps | Vanguard Wellington Adm (VWENX) | 16 bps | Asset Allocation—50% to 70% Equity |
| MFS New Discovery Fund R6 (MNDKX) | 97 bps | Vanguard Small Cap Growth Index Inst (VSGIX) | 6 bps | Lord Abbett Developing Growth R6 (LADVX)<br><br>Vanguard Explorer Adm (VEXRX) | 60 bps<br><br>37 bps | Small Growth |
| MFS New Discovery Value Fund R6 (NDVVX) | 100 bps | Vanguard Small Cap Value Index Inst (VSIIX) | 6 bps | DFA US Target Value I (DFFVX) | 37 bps | Small Value |

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Research Fund R6 (MFRKX) | 48 bps | Fidelity Spartan 500 Index Inst (FXSIX)<br><br>BNY Mellon Large Cap Stock Index Fund CIT | 3.5 bps<br><br>3 bps | American Funds Fundamental Investor R6 (RFNGX)<br><br>Vanguard Growth & Inc Adm (VGIAX) | 31 bps<br><br>23 bps | Large Blend |
| MFS Research International Fund R6 (BRXVX) | 77 bps | Fidelity Spartan Int'l Idx Inst (FSPNX)<br><br>BNY Mellon International Stock Index CIT | 6 bps<br><br>7 bps | Dodge & Cox International Stock (DODFX)<br><br>DFA Large Cap Int'l (DFALX) | 64 bps<br><br>23 bps | Foreign Large Blend |
| MFS Strategic Income Fund I (MFIIX) | 81 bps | Fidelity US Bond Index Premium (FSITX)<br><br>BNY Mellon Aggregate Bond Index Fund Instl | 5 bps<br><br>4 bps | PIMCO Income I (PIMIX) | 45 bps | Multisector Bond |
| MFS Technology Fund R6 (MTCLX) | 92 bps | Vanguard Information Technology Index Adm (VITAX) | 10 bps | Ivy Science & Technology R6 (ISTNX) | 83 bps | Technology |
| MFS Total Return Bond Fund R6 (MRBKX) | 50 bps | Fidelity US Bond Index Premium (FSITX)<br><br>BNY Mellon Aggregate Bond Index Fund Instl | 5 bps<br><br>4 bps | Baird Core Plus Bond Inst (BCOIX) | 30 bps | Interm-Term Bond |
| MFS Total Return Fund R6 (MSFKX) | 41 bps | Vanguard Balanced Index Inst (VBAIX) | 6 bps | Vanguard Wellington Adm (VWENX) | 16 bps | Asset Allocation —50% to 70% Equity |
| MFS U.S. Government Money Market Fund (MCMXX) | 61 bps | | | Vanguard Federal Money Market Inv (VMFXX) | 11 bps | Money Market |
| MFS Utilities Fund R6 (MMUKX) | 64 bps | Vanguard Utilities Index Adm (VUIAX) | 10 bps | Franklin Utilities R6 (FUFRX) | 47 bps | Utilities |

| Fund in Plan | Exp. Ratio | Passive Mutual Fund/CIT Alternative | Exp. Ratio | Active Mutual Fund Alternative | Exp. Ratio | Investment Style |
|---|---|---|---|---|---|---|
| MFS Value Fund R6 (MEIKX) | 51 bps | TIAA-CREF Large-Cap Value Idx I (TILVX)<br><br>BNY Mellon Large Cap Value Stock Index Fund CIT | 6 bps<br><br>3.7 bps | American Funds American Mutual Fund R6 (RMFGX)<br><br>Vanguard Equity Income Adm (VEIRX) | 30 bps<br><br>17 bps | Large Value |

83.    Despite the high cost of the proprietary investments within the Plans, Defendants failed to consider removing these proprietary investments in favor of lower-cost, nonproprietary options because it would have been contrary to MFS's business interests.

84.    Consistent with the predictions of the academic literature, the high fees within the Plans' proprietary investments caused the Plans' investments to underperform, costing the Plans tens of millions of dollars in lost benefits that participants would have had in their accounts had the Plans' investments been managed in a prudent and impartial manner.

85.    Had Defendants prudently monitored the investments within the Plans, in a process that was not tainted by self-interest, Defendants would have removed the Plans' investments in the MFS funds (and the Russell funds) in favor of investments such as the funds listed above that offered comparable investment management services and similar or superior performance at significantly less expense.

86.    Given the excessive fees charged by the mutual funds in the Plans, and the availability of comparable or superior funds with significantly lower expenses, the compensation paid to the MFS entities for their services was unreasonably high.

III.   DEFENDANTS FAILED TO PROCURE THE LEAST EXPENSIVE AVAILABLE SHARE CLASS OF NUMEROUS FUNDS

87.    Defendants also failed to procure the lowest-cost share class of numerous mutual

funds in the Plans. By way of background, most mutual funds offer multiple classes of shares that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets (generally $1 million or more) and therefore greater bargaining power. For plans as large as the Plans, mutual fund companies will often grant waivers to these investment minimums upon request so long as the fund in question is being added to the plan's lineup of designated investment alternatives.

88.     There is no material difference between share classes other than the costs. Thus, utilizing the cheapest share class, if available, provides an identical—but less expensive— version of the same investment, including the identical manager and an identical mix of investments within each fund. Given the Plans' size, and the Plans' uniquely intimate relationship with the investment manager (MFS), the Plans had sufficient bargaining power and access to the most up-to-date information to obtain the lowest-cost share class available at any given time for the Plans' investment lineup of proprietary MFS mutual funds. However, the Committees did not promptly move to lower-cost share classes as they became available.

89.     For example, in 2013, the Committees retained so-called institutional shares of the MFS Growth Fund and the MFS Value Fund with expense ratios of 0.87% and 0.71% respectively. Yet, otherwise identical R5 shares of the same funds were available and had lower expense ratios of 0.78% and 0.60%, respectively. R5 shares of the MFS Growth Fund became available on June 1, 2012, and R5 shares of the MFS Value Fund in May 2012. There is no justification for Defendants' failure to timely transition out of the higher-cost share classes. Defendants also retained share classes in several other funds that were more expensive than alternative share classes from the same funds.

90.     The Committees' failure to timely move Plan assets from the higher-cost shares was beneficial to MFS, which collected the excess fees paid by the Plans. To illustrate, for the Plans' roughly $53 million invested in the MFS Growth Fund in 2013 alone, the Plans lost, and MFS collected, an excess of approximately $47,869 in investment management fees due to the failure to move the Plans to R5 shares of the fund. Indeed, from 2012 through 2015, MFS collected an additional $191,442 in excess fees associated with the higher-fee share class of the MFS Growth Fund. MFS earned these higher fees despite the fact that MFS performed the exact same services for the Plans that it would have provided had the Plans owned R5 shares of the MFS Growth Fund.

91.     This is by no means the only example. In 2012, MFS introduced R5 shares for at least 23 of the Plans' designated investment alternatives, and an additional 15 funds in 2013. In every case, had the Plans switched to these lower-cost share classes, the Plans would have reduced investment management fees by amounts similar to the MFS Growth and MFS Value examples above. Yet, for all 38 of these funds, the Committees did not transition the Plans into R5 shares until 2015, years after the less expensive share class had been introduced.

92.     A prudent fiduciary would have taken advantage of less expensive classes of shares of the Plans' MFS investments as soon as the better share class became available. Many fiduciaries of other plans did just this. Because MFS and the Committees did not timely transition Plan assets into available R5 or R6 shares as other fiduciaries did for their plans, the MFS entities were able to collect excessive fees from Plan assets throughout the statutory period. Through these actions and omissions, Defendants breached their duty of loyalty and their duty of prudence, and dealt with Plan participants on a less favorable basis than other shareholders.

**IV.    DEFENDANTS CAUSED THE PLANS TO PAY EXCESSIVE RECORDKEEPING COSTS**

93.    The Plans' high costs are also due in part to the excessive recordkeeping fees Defendants have caused the Plans to pay.

94.    Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is therefore highly competitive, with many vendors equally capable of providing high-level services. As a result of such competition, vendors vigorously compete for business by offering the best price.

95.    The cost of providing recordkeeping services depends on the number of participants in a plan. Given that it costs the same to provide recordkeeping to a participant with $1,000 in his or her retirement account as a participant with $100,000, the amount of money in participants' accounts is generally not relevant.

96.    Some mutual funds engage in a practice known as "revenue sharing" where the mutual fund takes a portion of the expense ratio it charges investors and pays it to the plan's recordkeeper. The Department of Labor requires plans to identify which of their service providers are being paid via revenue sharing, which is referred to as "indirect compensation" on the Form 5500. While revenue sharing can be a legitimate means of paying recordkeeping expenses, the amounts being paid to the recordkeeper increase as a plan grows larger. Thus, left unmonitored, a revenue sharing scheme can result in increasingly excessive payments to recordkeepers.

97.    In order to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including recordkeeping fees and other sources of compensation, paid to the service provider. To the extent that a plan's investment options pay asset-based revenue sharing

to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and will negotiate a recordkeeping contract whereby all revenue sharing payments in excess of an agreed-upon, reasonable level, are returned to the plan and its participants. This is generally accomplished through the creation of a revenue sharing account, also commonly referred to as a plan expense account or a plan expense reimbursement account.

98.     As part and parcel of monitoring recordkeeping expenses, prudent fiduciaries submit requests for proposal (RFPs) to potential recordkeeping service providers (every few years at a minimum, and more frequently if particular circumstances demonstrate the plan's recordkeeping expenses may be excessive) to obtain cost information regarding what other recordkeepers would charge the plan for a particular set of recordkeeping services. The RFP process allows prudent fiduciaries to determine if their recordkeeping arrangement is competitive, and if it is not, make appropriate changes.

99.     Based on Plaintiffs' preliminary investigation and analysis, a normal range of recordkeeping fees for plans like the Plans at issue would have been, in aggregate, between approximately $55 and $80 per participant from 2009 to 2012, and between approximately $50 and $75 per participant from 2013 to the present.

100.    The recordkeeping fees actually paid by the Plans greatly exceeded the normal range. For the majority of the relevant period, the Plan's recordkeepers (Hartford Retirement Services, LLC until 2013, and MassMutual Retirement Services until September 2015) received

in excess of $500 per participant per year in revenue sharing from the Plans' investments. These payments were at least six times higher than the amount a prudent fiduciary would have paid.[16]

101.    The Committees sat by idly for years as the Plans paid these grossly excessive recordkeeping fees. The Plans continued to pay excessive fees until September 1, 2015, when Defendants switched recordkeeping service providers and began to utilize Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") as the Plans' recordkeeper.

102.    Defendants' failure to prudently manage the Plans' administrative expenses has cost the Plans' participants millions of dollars in excessive recordkeeping payments that a prudent fiduciary would have directed to participants' accounts.

## V.    DEFENDANTS FAILED TO INVESTIGATE THE USE OF SEPARATE ACCOUNTS AND COLLECTIVE TRUSTS

103.    The high cost of the Plans was compounded by Defendants' failure to adequately investigate non-mutual fund alternatives such as separately managed accounts and collective trusts.

104.    Separate accounts are widely available to large plans such as the Plans. *See Study of 401(k) Plan Fees and Expenses*, *supra*.   By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." *Id*.

105.    Separate accounts offer a number of advantages over mutual funds, including the ability to negotiate fees.  Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund.

---

[16] These estimates of per-participant recordkeeping costs assume that the membership of the two Plans overlapped, since all eligible employees were automatically enrolled in the DC Plan. Even assuming there was little to no overlap in the Plans' membership, however, the recordkeeping costs would be grossly excessive on a per-participant basis.

106.    MFS itself offers its institutional clients separately-managed accounts in the same investment styles as many of the Plans' proprietary mutual funds, including, for example, the MFS Growth/Core Growth Separate Account, the MFS Core Equity Separate Account, the MFS New Discovery Separate Account, and the MFS Value Separate Account.

107.    MFS's advertised fee schedule for these accounts is well below the fees charged by the corresponding mutual funds. For example, the cost of the MFS Growth Separate Account ranges from 45 to 60 basis points. The corresponding MFS Growth Fund offered in the Plans, by contrast, ranged from 73 to 93 basis points between 2012 to the present. Utilizing the corresponding separate account in place of the MFS Growth Fund, the Plans' investments in this fund would have saved at least 13 basis points in fees annually, and likely more.

108.    Similarly, Defendants could have reduced the expenses paid in the MFS Core Equity Fund by at least 25 basis points by converting the mutual fund to the separate account structure advertised by MFS to its institutional clients. In the same manner, Defendants could have reduced the expenses paid in the MFS New Discovery Fund and the MFS Value Fund by at least 13 and 7 basis points, respectively.

109.    Moreover, unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules. Accordingly, the fee savings that Defendants could have obtained for the Plans was even greater than the amounts reflected in the investment managers' advertised fee schedules.

110.    Collective trusts also would have provided much lower investment management fees than the Plans' mutual funds. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more. Anne

Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015), *available at* http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400.

111.    MFS itself offered collective trusts with the same investment styles as several mutual funds in the Plans, at lower cost. For example, the MFS Growth Equity collective trust has an expense ratio ranging from 45 to 60 basis points, yet in 2015 the Plans' investment in the MFS Growth mutual fund was assessed fees of 73 basis points, costing the Plans an excess of at least 13 basis points in fees. Similar savings were available from several other collective trust offerings.

112.    Defendants could have used the Plans' bargaining power, and their relationship with MFS, to obtain high-quality, lower-cost alternatives to mutual funds, in order to negotiate the best possible price for the investment management services MFS provided to the Plans.  By failing to investigate the use of these institutional alternatives for the Plans' actively-managed funds, Defendants caused the Plans to pay millions of dollars per year in unnecessary investment fees.  Furthermore, by offering these institutional investment vehicles to shareholders in other plans but not offering them to the Plans' participants, MFS dealt with other shareholders on a more favorable basis than the Plans' participants.

VI.    **DEFENDANTS FAILED TO ADEQUATELY MONITOR PLAN INVESTMENTS AND REMOVE POORLY PERFORMING INVESTMENTS**

113.    Defendants also failed to monitor the Plans' investments, and failed to remove numerous funds that had a history of underperformance, in violation of their fiduciary duties under ERISA. This cost Plan participants millions of dollars due to these funds' underperformance compared with prudent investment alternatives. Though numerous funds

within the Plans were imprudent and should have been removed from the Plans, the following examples highlight Defendants' failure to remove imprudent investments from the Plans.

114.    During the statutory period, the Plans have included the MFS Money Market Fund, renamed the MFS U.S. Government Money Market Fund in 2014, as a short-term investment option designed to protect investors' principal and provide income. As of year-end 2015, the Plans had more than $28.5 million in this money market fund.

115.    From 2011 through 2015, the Plans' money market funds returned 0.01% or less per year. During the same period, the funds' expense ratios exceeded 0.60%—more than 60 times more than the income paid to investors. In 2016, the money market fund had barely improved, returning only 0.07% despite having an expense ratio of 0.61% reported on the December 2016 prospectus.

116.    For the last six years, the money market funds in the Plans have not even come close to keeping up with the rate of inflation. This was predictable because these funds use very short-duration investment vehicles, such as short-term U.S. Treasury notes, which provide minimal returns. Given the expected returns of money market funds and similar short-term investments, a prudent fiduciary would have known that the MFS Money Market Fund and the MFS U.S. Government Money Market Fund would not provide participants any meaningful retirement benefits. Indeed, accounting for inflation, participants invested in these options actually lost money. Accordingly, a prudent and loyal fiduciary would have removed these options and instead offered a stable value fund, which would have provided significantly higher returns while still offering protection of principal.

117.    Stable value funds are a common investment in 401(k) plans. Like money market funds, stable value funds provide preservation of principal. And "[b]ecause they hold longer-

duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006). Indeed, even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), *available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf.   Thus, many large 401(k) plans have stable value funds.

118.   A 2011 study from Wharton Business School analyzed money market and stable-value fund returns from the previous two decades and concluded that "any investor who preferred more wealth to less wealth should have avoided investing in money market funds when [stable value] funds were available, irrespective of risk preferences." David F. Babbel & Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011), *available at* http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf. Given the superior yields offered by stable value funds at comparable levels of risk, large 401(k) plans overwhelmingly choose stable value funds over money market funds. Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), *available at* http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30. "With yields hovering around 0%, money-market funds aren't a prudent choice for a 401(k)." *Id.*

119.   The returns that could have been achieved by transferring the assets in the Plan's money market funds to a stable value fund is illustrated by data from Hueler Analytics. The

Hueler Index is the industry standard for reporting and measuring returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds nationwide with assets totaling over $105 billion." *See* http://hueler.com (last visited May 30, 2017). Hueler data therefore represents a reasonable estimate of the returns of a typical stable value fund. As shown below, the returns of the funds in the Hueler universe on average have far exceeded the returns of the MFS Money Market Fund and MFS U.S. Government Money Market Fund.

| Year | MFS U.S. Government Money Market Fund (MCMXX) | Hueler Index |
|------|----------------------------------------------|--------------|
| 2010 | 0 bps | 312 bps |
| 2011 | 0 bps | 269 bps |
| 2012 | 0 bps | 226 bps |
| 2013 | 0 bps | 184 bps |
| 2014 | 0 bps | 169 bps |
| 2015 | 0 bps | 177 bps |
| 2016 | 7 bps | 179 bps |

120.    While Defendants did offer a stable value fund for a portion of the statutory period, Defendants never investigated removing the MFS money market funds from the Plans and moving those balances to the stable value fund, because this would have cost MFS the profits it was earning from the two money market funds.[17]

121.    Furthermore, the stable value collective investment trust was itself an imprudent selection. Before it was liquidated in 2014, the stable value fund in the Plans had been

---

[17] The MFS money market funds had been in the Plans for far longer than the stable value fund, and thus the balances in the money market funds were not a reflection of participant preference for the money market funds, but instead a result of participant inertia. In any event, it is a fiduciary's job to remove imprudent investments, even if some participants choose to invest in them. *See* 29 C.F.R. § 2550.404c-1(d)(1)(iv).

significantly underperforming the Hueler Index for several years. For example, the Hueler Index returned well in excess of 2% per year for the three-year period ending December 31, 2013, while the stable value fund in the Plans earned 1.03% per year.

122.    In 2014, the Investment Committee removed the stable value fund from the Plans, without investigating the availability of a better-performing stable value option, thus leaving the Plans without a prudent fixed investment option.

123.    In summary, Defendants imprudently retained the money market funds, and failed to offer a prudent stable value option in the Plans. As a result, Defendants caused the Plans to suffer millions of dollars in additional losses in the six years leading up to the filing of this lawsuit.

## VII.    PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES.

124.    Plaintiffs did not have knowledge of all material facts (including, among other things, the availability of less expensive alternative investments, the costs of the Plans' investments compared to those in similarly-sized plans, investment performance versus other available alternatives, the excessiveness of the Plans' recordkeeping costs compared to alternative service providers, the availability of less expensive share classes of investments held by the Plans, the availability of less expensive separate accounts and collective trust alternatives, and comparisons of the Plans' overall costs to the costs of other similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plans (including Defendants' processes for selecting, monitoring, evaluating and removing

Plan investments, and Defendants' processes for selecting and monitoring the Plans' recordkeeper), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Amended Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

125.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plans to bring an action individually on behalf of the Plans to obtain for the Plans the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

126.    Plaintiffs assert their claims in Counts I–III on behalf of a class of participants and beneficiaries of the Plans defined as follows:[18]

> All participants and beneficiaries of the Massachusetts Financial Services Company Defined Contribution Plan and the Massachusetts Financial Services Company MFSavings Retirement Plan at any time on or after July 7, 2011, excluding Defendants, employees with responsibility for the Plans' investment or administrative functions, and members of Defendants' Board of Directors.

127.    Numerosity:   The Class is so numerous that joinder of all Class members is impracticable. The Plans had approximately 2,000 to 2,500 participants during the applicable period.

128.    Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are Plan participants and suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other

---

[18] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Class members with regard to the Plans. Defendants' imprudent and disloyal decisions affected all Plan participants similarly. Defendants' unlawful conduct and fiduciary breaches as to each of the Plans were materially identical, and the two Plans were treated functionally as a single plan with respect to Defendants' decision-making and the exercise of discretionary authority.

129.   <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

130.   <u>Commonality</u>:   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a. Which Defendants are fiduciaries of the Plans;

   b. Whether the Plans' fiduciaries breached their fiduciary duties by engaging in the conduct described herein;

   c. Whether the Plans' fiduciaries are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

   d. Whether MFS breached its duty to monitor other Plan fiduciaries;

   e. Whether the Plans engaged in prohibited transactions in violation of 29 U.S.C. § 1106(a);

   f. The losses suffered by the Plan and the recoverability of those losses under 29 U.S.C. § 1109(a);

   g. Whether the MFS entities are liable under 29 U.S.C. § 1109(a) to disgorge the profits they earned as a result of the fiduciary breaches and prohibited transactions that occurred;

      h.   The proper form of equitable and injunctive relief;

      i.   The proper measure of monetary relief.

131.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

132.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of particular Plan investments or removal of a Plan fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plans that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

133.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Amended Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly

duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29  U.S.C. § 1104(a)(1)(A)–(B)**

134.     Defendants MFS, the Retirement Committee, and the Investment Committee are or were fiduciaries of the Plans under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

135.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plans and in their selection and monitoring of Plan investments.

136.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants were directly responsible for ensuring that the Plans' fees were reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets were invested prudently. This includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

137.     As described throughout this Amended Complaint, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the Plans' designated

investment alternatives, by prioritizing MFS's proprietary investments over other non-proprietary investment alternatives, and by failing to critically and objectively evaluate the cost and performance of the Plans' proprietary investments in comparison to non-proprietary investment options. Defendants imprudently and disloyally retained higher-cost MFS mutual funds (and Russell funds) despite the availability of lower-cost investments that offered comparable or superior investment management services. Defendants also failed to promptly transfer into lower-cost share classes of MFS funds when MFS introduced R5 or R6 share classes for many of the Plans' designated investment alternatives. Moreover, Defendants failed to investigate the use of separate accounts or collective trusts. Additionally, Defendants allowed the Plans to pay excessive recordkeeping fees by failing to monitor the Plans' service providers and revenue sharing arrangements to ensure that total recordkeeping fees were reasonable. Further, Defendants failed to monitor the Plans' investments and remove those that were imprudent, including investments that were duplicative of other, less expensive funds in the Plans, sector funds that offered no diversification benefit, and a money market fund that was earning sixty times more in fees for MFS than it was earning for participants.

138.    Each of the above-mentioned actions and failures to act described in paragraph 137 and throughout the Amended Complaint demonstrate Defendants' failure to make Plan investment decisions based solely on the merits of each investment and in the interest of Plan participants. These failures were flagrant and intentional.   Throughout the Class Period, Defendants' conduct and decisions were driven by their desire to drive revenues and profits to the MFS entities and to generally promote MFS's business interests. Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plans solely in the interest of the participants and beneficiaries of the Plans, and for the exclusive purpose of

providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

139.    Each of the above actions and omissions described in paragraph 137 and elsewhere in this Amended Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

140.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a) and 1132(a)(2), to make good to the Plans the losses resulting from the aforementioned breaches, to restore to the Plans any profits Defendants made through the use of Plan assets, and to restore to the Plans any profits resulting from the breaches of fiduciary duties alleged in this Count.

141.    Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor Fiduciaries

142.    As alleged throughout the Amended Complaint, the Defendants (including MFS, the Retirement Committee, the Investment Committee, and the members of the Committees) are fiduciaries of the Plans pursuant to 29 U.S.C. § 1002(21).

143.    MFS is responsible for appointing and removing members of the Committees.

144.    Given that MFS had overall oversight responsibility for the Plans, and the explicit fiduciary duty to appoint and remove members of the Committees, MFS had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Retirement and Investment Committees and their members.

145.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries are not meeting their fiduciary obligations.

146.    To the extent that MFS's fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

147.    MFS breached its fiduciary monitoring duties by, among other things:

    a.   Failing to monitor and evaluate the performance of its appointees or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the appointees' imprudent actions and omissions with respect to the Plans;

b.  Failing to monitor its appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c.  Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, all to the detriment of the Plans and Plan participants' retirement savings.

148.   As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses per year due to excessive fees and investment underperformance.

149.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), MFS is liable to restore to the Plans all losses suffered as a result of its failure to properly monitor the Plans' fiduciaries, and subsequent failure to take prompt and effective action to rectify any observed fiduciary breaches.

## COUNT III
### Prohibited Transactions with a Party in Interest
### 29 U.S.C. § 1106(a)(1)

150.   As a Plan employer, the Plan sponsor, and a service provider for the Plans, MFS is a party in interest under 29 U.S.C. § 1002(14).

151.   As a participating employer in the Plans and a service provider for the Plans, MFSC is also a "party in interest" under 29 U.S.C. § 1002(14).

152.   As described throughout the Amended Complaint, Defendants caused the Plans to utilize proprietary investments that generated revenue for the MFS entities.

153.   On a monthly basis throughout the relevant period, MFS deducted fees and expenses from the assets being held for the Plans that were invested in MFS-affiliated funds in

return for the investment management services provided to the Plans by MFS. MFS used a portion of these fees to compensate MFSC for its services as a transfer agent and dividend-paying agent for the funds.

154.    These transactions constituted a direct or indirect furnishing of services between the Plans and a party in interest, and a direct or indirect transfer of assets of the Plans to a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C) and (D).

155.    As a direct and proximate result of these prohibited transactions, the Plans directly or indirectly paid millions of dollars in fees in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plans and their participants.

156.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plans as a result of these prohibited transactions and disgorge all profits they earned in connection with the management of Plan assets or other services performed for the Plans in violation of 1106(a)(1).

## RESPONDEAT SUPERIOR

157.    With respect to each of Plaintiffs' above-stated causes of action, in addition to direct liability imposed by ERISA as a result of corporate actions and omissions, MFS is also vicariously liable under the doctrine of respondeat superior for the conduct of its employees. At all relevant times, the Committees and their members were employees of MFS acting within the scope of their employment when they violated ERISA with respect to the Plans by failing to act prudently and loyally and by causing the Plans to engage in prohibited transactions. MFS is therefore vicariously liable, as well as directly liable, for all of Plaintiffs' claims in Counts I–III. *See Kling v. Fid. Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 147 (D. Mass. 2004) ("[A] claim may be stated under ERISA for respondeat superior liability."); *Dias v. Brigham Med. Associates, Inc.*,

780 N.E.2d 447, 451 (Mass. 2002) ("Once employment is established, the only remaining issue is whether [the employee] was working for [the employer] at the time of the alleged [misconduct], i.e., whether [the employee's] treatment of the plaintiff was within the scope of his employment by [the employer].").

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and as representatives of the Class defined herein, and on behalf of the Plans, pray for relief as follows:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.  A declaration that Defendants have breached their fiduciary duties under ERISA;

D.  A declaration that Defendant MFS breached its fiduciary duty to monitor the Investment Committee and Retirement Committee and their members;

E.  A declaration that Defendants violated 29 U.S.C. § 1106 by allowing the Plans to engage in prohibited transactions;

F.  An order compelling Defendants to personally make good to the Plans all losses that the Plans incurred as a result of the breaches of fiduciary duties and prohibited transactions described above, and to restore the Plans to the position they would have been in but for this unlawful conduct;

G.  An accounting for profits under 29 U.S.C. § 1109(a);

H.  Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

I.  An award of pre-judgment interest;

J.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

K.     An award of such other and further relief as the Court deems equitable and just.


Dated: September 10, 2018                **NICHOLS KASTER, PLLP**

                                         /s/ Kai H. Richter
                                         Kai H. Richter, MN Bar No. 0296545
                                         Carl F. Engstrom, MN Bar No. 0396298
                                         Mark E. Thomson, MN Bar No. 0398260
                                         Jacob T. Schutz, MN Bar No. 0395648*
                                         4600 IDS Center
                                         80 S 8th Street
                                         Minneapolis, MN 55402
                                         Telephone: 612-256-3200
                                         Facsimile: 612-338-4878
                                         krichter@nka.com
                                         cengstrom@nka.com
                                         mthomson@nka.com
                                         jschutz@nka.com

                                         **BLOCK & LEVITON LLP**
                                         Jason M. Leviton (BBO #678331)
                                         Bradley J. Vettraino (BBO #691834)
                                         155 Federal Street, Ste. 400
                                         Boston, MA 02110
                                         Telephone: (617) 398-5600
                                         Facsimile: (617) 507-6020
                                         jason@blockesq.com
                                         bradley@blockesq.com

                                         ATTORNEYS FOR PLAINTIFFS

---

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: September 10, 2018              /s/ Kai H. Richter

---